IN THE SUPREME COURT OF NORTH CAROLINA

No. 59A20

Filed 11 December 2020

IN THE MATTER OF: Q.B.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 22 November 2019 by Judge Lee F. Teague in District Court, Pitt County. This matter was calendared for argument in the Supreme Court on 23 November 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Timothy E. Heinle for petitioner-appellee Pitt County Department of Social Services.*

*R. Bruce Thompson II for appellee Guardian ad litem.*

*Christopher M. Watford for respondent-appellant mother.*

DAVIS, Justice.

The issue in this case is whether the trial court abused its discretion by failing to reconsider whether respondent-mother (respondent) was entitled to the appointment of a guardian *ad litem* (GAL) to assist her in her termination of parental rights proceeding. Because we conclude that the trial court did not abuse its discretion in failing to sua sponte conduct such an inquiry, we affirm the trial court's order terminating respondent's parental rights.

**Factual and Procedural Background**

This case involves a termination of parental rights proceeding initiated by petitioner Pitt County Department of Social Services (DSS) against respondent on the basis of neglect and dependency of her minor child "Quanna."[1] On 20 September 2017—approximately one month before the birth of Quanna—DSS received a report regarding respondent and her family. DSS had prior involvement with respondent dating back to 2012 due to reports concerning respondent's alleged neglect of Quanna's three older siblings.

The 2017 report alleged that respondent was unable to properly care for herself and for her existing three children. The report stated that respondent was selling her food stamps, she was unable to provide proper housing, food, and other necessities for her children, and the home was uninhabitable due to a lack of utilities and rat infestation.

DSS visited the home to investigate and found it to be uninhabitable with no indoor plumbing, no functioning utilities, a partially caved-in ceiling, no food in the home, and a rat and cockroach infestation. The DSS visit also revealed that respondent "appeared to be limited" intellectually, that she had a learning disability and various health issues, and that the monthly social security income that the household received was not being used to meet the basic needs of respondent or her children. Accordingly, DSS began two simultaneous investigations into the

---

[1] A pseudonym is used to protect the identity of the juvenile.

household—a DSS Child Protective Services investigation regarding respondent's three children and a DSS Adult Protective Services investigation into respondent's ability to care for herself and meet her own basic needs.

As part of the latter investigation, an Adult Protective Services petition was filed after DSS substantiated caretaker neglect "as a result of [respondent] being a disabled adult and her caretakers not meeting her basic needs." Respondent's primary caretaker was her sister, who was also the designated payee for respondent's social security income. The investigation found that despite receiving $448 monthly in food stamps and $735 monthly in social security income, respondent and her children were not having their basic needs met.

Respondent gave birth to Quanna in November 2017. While respondent was in the hospital, she became belligerent with hospital staff and demanded to be released with Quanna, despite having no plans for transportation and having obtained no crib, formula, diapers, or other necessities for the child. Moreover, after Quanna's birth the social security checks that the entire household had depended upon for income were suspended. Accordingly, on 1 December 2017 DSS filed a petition alleging that Quanna was a neglected and dependent juvenile and obtained nonsecure custody of her.

Pursuant to a request by DSS, respondent completed a psychological evaluation on 10 January 2018. The examiner, psychologist Rhonda Cardinale, reported that respondent had an IQ score of 63, which fell within the low functioning

range of clinical impairment. Cardinale stated her opinion that respondent's evaluation "reflects that her overall level of intellectual functioning as well as her overall level of adaptive behavior skills falls into the range of clinical impairment." Cardinale opined that due to respondent's cognitive defects, she "would have difficulty independently and adequately making positive decisions for herself" and would "require assistance in ensuring that her basic needs are adequately met." Cardinale accordingly recommended that "the appointment of a guardian and/or legal decision maker be considered" for respondent.

On 25 January 2018, the District Court, Pitt County, conducted a hearing at the request of DSS to determine whether to appoint a GAL for respondent pursuant to Rule 17 of the North Carolina Rules of Civil Procedure with regard to the juvenile proceeding involving Quanna. The trial court subsequently entered an order on 15 February 2018 finding that although respondent was "low-functioning," she "underst[oo]d the role of the Court and the parties in the Courtroom as well as the Court's function in determining the status of the Juveniles." The trial court concluded that respondent was "not incompetent in accordance with Rule 17" and was "not therefore entitled to a substitutive Rule 17 Guardian."

An adjudication hearing was conducted on the juvenile petition regarding Quanna on 1 February 2018. Respondent stipulated to the facts alleged in the petition. The trial court entered an order on 22 February 2018 determining that Quanna was a neglected and dependent juvenile. The trial court ordered DSS to

retain custody of Quanna and granted respondent weekly supervised visitation sessions. Respondent was also ordered to obtain appropriate housing, complete a parenting program and demonstrate skills learned, submit to drug screens, maintain communication with DSS, comply with all recommendations made by Adult Protective Services, and submit to a psychological evaluation.

On 25 April 2018, respondent was adjudicated to be incompetent in a separate proceeding brought by DSS Adult Protective Services in Superior Court, Pitt County. As a result, the Beaufort County DSS was appointed to serve as the guardian of her person pursuant to Chapter 35A of the General Statutes.[2] In addition, respondent was assigned a Pitt County Adult Protective Services counselor, Priscilla Delano, to help her manage her bills and healthcare needs. Delano also became the payee for respondent's social security checks.

Respondent underwent a parenting capacity evaluation with a psychologist, Dr. Robert Aiello, on 5 April 2019. Dr. Aiello recommended that (1) respondent be referred for individual counseling; (2) she submit to random drug tests to ensure she refrained from using marijuana; (3) parties working with respondent "review written documents with her carefully and in simple terms;" (4) respondent continue her payee arrangement with Delano because she "should not be expected to manage funds

---

[2] According to the superior court's order, respondent's guardian of the person was authorized to maintain "the custody, care and control of the ward, but has no authority to receive, manage or administer the property, estate or business affairs of the ward."

independently;" and (5) Adult Protective Services continue to monitor and assist respondent to see to her medical needs and ensure she was taking her prescribed medications.

The trial court held permanency planning hearings in October 2018, January 2019, and May 2019. The resulting permanency planning orders concluded that although respondent had completed parenting classes and attended visitation sessions, she was still unable to properly parent Quanna independently due to her mental deficiencies, inability to manage her finances, and lack of appropriate support. The trial court consequently ordered that DSS cease reunification efforts with respondent and adopted a primary permanent plan of guardianship with a court-approved caretaker and a secondary plan of adoption for Quanna.

On 13 June 2019, DSS filed a petition to terminate respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1) and (a)(6) on the grounds of neglect and dependency. A termination hearing was held on 24 October 2019. On 22 November 2019, the trial court entered an order concluding that the termination of respondent's parental rights in Quanna was warranted based on both grounds alleged by DSS. The trial court entered a separate dispositional order that same day concluding that it was in Quanna's best interests that respondent's parental rights be terminated.[3] Respondent appealed to this Court from both orders on 19 December 2019.

---

[3] The trial court also terminated the parental rights of Quanna's father, who is not a party to this appeal.

## Analysis

Respondent's primary argument on appeal is that the trial court abused its discretion by failing to sua sponte conduct a second inquiry into whether she should be appointed a GAL under Rule 17 to assist her during the termination proceeding. Section 7B-1101.1(c) of the Juvenile Code provides that a trial court may appoint a GAL "[o]n motion of any party or on the court's own motion" when a parent is "incompetent in accordance with . . . Rule 17." N.C.G.S. § 7B-1101.1(c) (2019). In essence, respondent's argument is that although a Rule 17 hearing already took place in January 2018, by the time the termination hearing occurred in October 2019 new events had occurred that rendered it necessary for the trial court to re-examine respondent's competency. In support of her argument, respondent relies heavily on *In re T.L.H.*, 368 N.C. 101, 772 S.E.2d 451 (2015)—the leading decision from this Court discussing the need for the appointment of a GAL under Rule 17 in a termination proceeding.

*In re T.L.H.* concerned the circumstances under which a trial court is obligated to sua sponte "inquire into a parent's competence to determine whether it is necessary to appoint a guardian *ad litem* for that parent" in the context of a termination proceeding. *Id.* at 102, 772 S.E.2d at 452. The respondent-mother in that case had voluntarily placed her newborn child in the custody of the Guilford County Department of Health and Human Services (DHHS) shortly after the child's birth in April 2013, due to her concerns regarding the presence of illegal drugs in her

residence and the unsafe behavior of her romantic partner. She also acknowledged that she suffered from mental health problems and she had not been taking her prescribed psychotropic medications. *Id.*

DHHS subsequently filed a petition in April 2013 alleging that the child was neglected and dependent based, in part, upon allegations that the respondent "ha[d] been to the hospital on several occasions in the last year due to mental health complications" and that she "ha[d] diagnoses of schizoaffective disorder, bipolar, cannabis abuse and personality disorder." *Id.* The petition also noted that the respondent's sole source of income was a monthly social security disability check "that had been awarded based on her diagnosed mental conditions." *Id.* at 103, 772 S.E.2d at 453.

Later that same month, the trial court—at the request of DHHS—appointed the respondent a GAL under Rule 17 on a "provisional/interim basis." *Id.* at 103, 772 S.E.2d at 452. The GAL ultimately served as respondent's advocate throughout the spring and summer of 2013, appearing on respondent's behalf at adjudication and disposition hearings and at a subsequent permanency planning hearing. *Id.* at 104, 772 S.E.2d at 453. In September 2013, DHHS filed a petition to terminate the respondent's parental rights and also requested that the trial court make an inquiry as to whether the respondent "need[ed] to have a Guardian ad Litem appointed for purposes of the [termination] proceeding." *Id.*

The trial court conducted a pretrial hearing in November 2013. At this hearing, the trial court released the respondent's GAL "[w]ithout making any specific findings concerning respondent's mental condition or the reasons underlying [the GAL's] initial appointment." *Id*. The termination hearing (at which the respondent did not appear) occurred in January 2014, and the trial court entered an order terminating respondent's parental rights. *Id*. at 104–05, 772 S.E.2d at 453–54. On appeal, the respondent argued that the trial court had abused its discretion by "failing to conduct an inquiry concerning whether she was entitled to the appointment of a [GAL under Rule 17]" in connection with her termination proceeding. *Id*. at 105, 772 S.E.2d at 454. We disagreed, holding that no abuse of discretion by the trial court had occurred. *Id*.

Initially, we noted that "[a] trial judge has a duty to properly inquire into the competency of a litigant in a civil trial or proceeding when circumstances are brought to the judge's attention [that] raise a substantial question as to whether the litigant is *non compos mentis*." *Id*. at 106–07, 772 S.E.2d at 455 (citing *In re J.A.A.*, 175 N.C. App. 66, 72, 623 S.E.2d 45, 49 (2005)). Because such judgments are discretionary in nature, we explained that "both the appointment of a [GAL] and the extent to which an inquiry concerning a parent's competence should be conducted" are reviewed for abuse of discretion. *Id*. at 107, 772 S.E.2d at 455.

We ultimately held that the trial court's failure to conduct a Rule 17 competency inquiry did not amount to an abuse of discretion. *Id.* at 108, 772 S.E.2d at 456. We explained our reasoning as follows:

> As an initial matter, we note that the standard of review applicable to claims like the one before us in this case is quite deferential. Affording substantial deference to members of the trial judiciary in instances such as this one is entirely appropriate given that the trial judge, unlike the members of a reviewing court, actually interacts with the litigant whose competence is alleged to be in question and has, for that reason, a much better basis for assessing the litigant's mental condition than that available to the members of an appellate court, who are limited to reviewing a cold, written record.
>
> Moreover, evaluation of an individual's competence involves much more than an examination of the manner in which the individual in question has been diagnosed by mental health professionals. Although the nature and extent of such diagnoses is exceedingly important to the proper resolution of a competency determination, the same can be said of the information that members of the trial judiciary glean from the manner in which the individual behaves in the courtroom, the lucidity with which the litigant is able to express himself or herself, the extent to which the litigant's behavior and comments shed light upon his or her understanding of the situation in which he or she is involved, the extent to which the litigant is able to assist his or her counsel or address other important issues, and numerous other factors. A great deal of the information that is relevant to a competency determination is simply not available from a study of the record developed in the trial court and presented for appellate review. As a result, when the record contains an appreciable amount of evidence tending to show that the litigant whose mental condition is at issue is not incompetent, the trial court should not, *except in the most extreme instances*, be held on

appeal to have abused its discretion by failing to inquire
into that litigant's competence.

*Id.* at 108–09, 772 S.E.2d at 456 (emphasis added).

After carefully reviewing the record in *In re T.L.H.*, this Court held that there was sufficient evidence in the record to allow the trial court to reasonably conclude that the respondent was competent. *Id.* at 109, 772 S.E.2d at 456. For example, we noted that the respondent had exercised "proper judgment" in allowing DHHS to take custody of her child shortly after his birth and had demonstrated a "reasonable understanding of the proceedings" when she informed DHHS that—despite her relinquishment of custody—she still wished to preserve her right to be reunified with her child. *Id.* We also observed that the testimony the respondent had provided at her permanency planning hearing was "cogent and gave no indication that she failed to understand the nature of the proceedings." *Id.* For instance, the respondent testified that she had obtained medication to treat her mental conditions, discussed the need for budgeting and careful management of her income, demonstrated an understanding of the need to apply for subsidized housing, and testified that she had moved into a new apartment after realizing that "obtaining an independent place to live would allow her to become drug-free." *Id.* at 109, 772 S.E.2d at 456-47. This Court concluded that this evidence suggested that the respondent "understood that she needed to properly manage her own affairs and comprehended the steps she needed to take in order to avoid the loss of her parental rights." *Id.*

In the present case, respondent asserts that these principles from *In re T.L.H.* support the proposition that the trial court abused its discretion in failing to sua sponte conduct a second Rule 17 competency hearing. She argues that at the time of the 24 October 2019 termination hearing there was new evidence before the trial court showing her diminished capacity that had not been available to the trial court at the time of her initial Rule 17 competency hearing on 25 January 2018. Namely, respondent points to (1) the results of her January 2018 cognitive evaluation (which found her to have borderline intellectual functioning); (2) her official adjudication of incompetency in April 2018; (3) the appointment of a legal guardian and an Adult Protective Services counselor to manage her finances and medical decisions; and (4) the results of her April 2019 parenting capacity evaluation (which recommended against independent parenting).

We disagree with respondent's argument, because we believe that here—as in *In re T.L.H.*—the record contains "an appreciable amount of evidence tending to show that [respondent] was not incompetent" at the time of the termination hearing. *Id.* at 108–09, 772 S.E.2d at 456. First, we note that respondent received a competency hearing on 25 January 2018 in order to determine whether the appointment of a GAL for her under Rule 17 was necessary. During this hearing, respondent was represented by her attorney, and the trial court heard testimony from several witnesses, including respondent, respondent's sister, and several different social workers connected to the case. The trial court also had access to the results of

respondent's cognitive evaluation, which was conducted several weeks prior to the hearing. In its order entered 15 February 2018, the trial court found that although respondent was "low-functioning," she nevertheless "underst[oo]d the role of the Court and the parties in the Courtroom as well as the Court's function in determining the status of the Juveniles." The trial court concluded that respondent was "not incompetent in accordance with Rule 17" and was therefore not entitled to a GAL under Rule 17.

Second, respondent's competency is supported by the fact that she attended all hearings related to this matter (including three permanency planning hearings that took place after January 2018), which gave the trial court a sufficient opportunity to continue to observe her capacity to understand the nature of the proceedings. *See In re J.R.W.*, 237 N.C. App. 229, 235, 765 S.E.2d 116, 121 (2014) ("[T]he fact that Respondent attended all but one of the hearings . . . gave the trial court ample opportunity to observe and evaluate her capacity to act in her own interests.").

Third, respondent's testimony during the termination hearing on 24 October 2019 demonstrates that she understood the nature of the proceedings and her role in them as well as her ability to assist her attorney in support of her case. Respondent's testimony indicated that she was able to comprehend all questions posed to her and that she responded appropriately in a lucid and cogent manner. Her testimony suggested that she understood (1) how her lack of contact with Quanna could impact the strength of the bond between them; (2) how mental health issues can affect a

person's parenting abilities; (3) the importance of attending court proceedings consistently and the effect that might have on her reunification efforts; (4) the importance of complying with DSS recommendations and attending all DSS appointments; (5) the correlation between her medications and her health along with the importance of following her doctor's recommendations; (6) the details of her payee arrangement with DSS as the recipient of her social security income; (7) the need to budget and manage money appropriately; (8) the importance of finding appropriate housing if her children were to be returned to her care; and (9) how to obtain emergency and medical care for her children.

The testimony offered by respondent here is similar to the testimony that was given by the respondent in *In re T.L.H.* There, we determined that the respondent's testimony was cogent because it demonstrated that she (1) had a "reasonable understanding of the proceedings" and their consequences; and (2) understood the need to "properly manage her own affairs and comprehended the steps she needed to take in order to avoid the loss of her parental rights," such as consistently taking her medications, properly managing her money, applying for subsidized housing, and moving into a new apartment that would provide a drug-free environment. *In re T.L.H.*, 368 N.C. at 109, 772 S.E.2d at 456–47.

Moreover, as in *In re T.L.H.*, the testimony of DSS social workers during respondent's termination hearing here demonstrated that she had the ability to exercise "proper judgment" by finding appropriate housing on her own, completing a

parenting program, maintaining contact with DSS, complying with recommendations made by Adult Protective Services, submitting to psychological and parenting evaluations, and attending all scheduled visits with Quanna. *See id.* at 109, 772 S.E.2d at 456. This evidence demonstrates that respondent understood the steps she needed to take to reunify with Quanna and had the ability to complete the majority of her case plan.

Respondent, however, attempts to distinguish her circumstances from those in *In re T.L.H.*, contending that there existed far more evidence in her case tending to show a lack of competence. Specifically, respondent argues that—unlike the mother in *In re T.L.H.*—(1) she received a great deal of assistance and government services stemming from her cognitive limitations; (2) the results of her cognitive evaluation showed that she had significantly diminished intellectual capacity; and (3) she was formally adjudicated to be incompetent prior to the termination hearing. Respondent thus argues that substantial evidence existed by the time of the termination hearing that her mental state had deteriorated to the point that a re-examination of her competency was necessary. We are not persuaded.

Admittedly, the record contained some evidence tending to cast doubt on respondent's competency, which may have supported a decision to conduct a second Rule 17 competency inquiry had the trial court elected to do so. However, given our deferential standard of review, we are unable to conclude that the trial court abused its discretion by failing to sua sponte conduct another hearing on the issue of whether

respondent was entitled to a GAL pursuant to Rule 17. *See In re T.L.H.*, 368 N.C. at 108–09, 772 S.E.2d at 456 ("[T]he standard of review applicable to claims like the one before us in this case is quite deferential . . . . the trial court should not, *except in the most extreme instances*, be held on appeal to have abused its discretion by failing to inquire into [a] litigant's competence.") (emphasis added).

It is true that respondent's cognitive evaluation demonstrated that she had an IQ score of 63, which fell within the low functioning range of clinical impairment and suggested that she may have difficulty in independent decision-making. It is also true that respondent received various government services in connection with her mental limitations, such as social security disability income and healthcare/money-management assistance from Adult Protective Services.

However, as our case law demonstrates, neither mental health limitations nor a low IQ constitute per se evidence of a lack of competency for purposes of Rule 17. *See In re T.L.H.*, 368 N.C. at 110, 772 S.E.2d at 457 (holding that a trial court is not required to "inquire into a parent's competency solely because the parent is alleged to suffer from diagnosable mental health conditions"); *see also In re Z.V.A.*, 373 N.C. 207, 210, 835 S.E.2d 425, 429 (2019) (holding that although the respondent had an IQ of 64, the evidence did not suggest that her disability "rose to the level of incompetence so as to require the appointment of a [GAL under Rule 17] to safeguard [her] interests"); *In re J.R.W.*, 237 N.C. App. at 234, 765 S.E.2d at 120 ("[E]vidence of

mental health problems is not *per se* evidence of incompetence to participate in legal proceedings.").

It is also true that on 25 April 2018 respondent was adjudicated to be incompetent by the Superior Court, Pitt County, and as a result was appointed a guardian of her person and an Adult Protective Services counselor. However, we are unable to agree with respondent that these facts mandated a sua sponte competency determination.

Adjudications of adult incompetency are governed by Chapter 35A of our General Statutes. N.C.G.S. § 35A-1102. An adult guardian appointed under Chapter 35A generally has a broad range of powers with respect to the ward's person and property, N.C.G.S. § 35A-1241, whereas the duties of a GAL under Rule 17 appointed solely for purposes of assisting a parent during a particular juvenile proceeding are much more limited. *See* N.C.G.S. § 1A-1, Rule 17(e) (stating that a GAL "shall file and serve such pleadings as may be required" to assist the parent).

Accordingly, in determining whether the appointment of a GAL under Rule 17 is necessary in a termination proceeding, our courts have typically limited the scope of our examination to a determination of whether the parent is able to comprehend the nature of the proceedings and aid her attorney in the presentation of her case. *See In re T.L.H.*, 368 N.C. at 108, 772 S.E.2d at 456 (finding that a litigant's competence may be demonstrated by her "reasonable understanding of the proceedings" and by "the extent to which the litigant is able to assist his or her

counsel"); *In re J.A.A.*, 175 N.C. App. at 71, 623 S.E.2d at 48 (stating that when a court inquires into the competency of a parent under Rule 17, the court must "determine whether . . . the individual would be unable to aid in their defense at the termination of parental rights proceeding"). Thus, it follows that an individual can simultaneously be found incompetent under Chapter 35A yet not require a GAL under Rule 17.[4]

Furthermore, we note that in August 2019 (two months prior to the termination hearing), respondent's guardianship was changed to a limited guardianship. During the August 2019 guardianship hearing, the court found that respondent "understands conversation and communicates personal leads," "has the capacity to communicate important decisions," "[h]as capacity to appropriately relate to friends and family members, has capacity to make decisions without undue influence from others . . . and can utilize familiar community resources" for assistance. The court therefore determined that respondent's guardianship should be changed from a full guardianship to a limited guardianship. As a result, her "rights and privileges were increased," and she was granted authority to "participate in residential planning," handle larger amounts of money, "maintain her personal

---

[4] In fact, at least one commentator has acknowledged this precise scenario. *See* Janet Mason, GUARDIAN AD LITEM FOR RESPONDENT PARENTS IN JUVENILE CASES, Univ. of N.C. Sch. of Gov., 2014 Juvenile Law Bulletin 1, 20 (January 2014) (noting that "[a]ssessing competence in relation to a person's ability to participate meaningfully in the litigation also leaves open the possibility that someone who could be adjudicated incompetent in a proceeding under G.S. Chapter 35A . . . could participate meaningfully and assist the attorney in a juvenile case without the involvement of a guardian ad litem").

property," and independently make "decisions regarding any legal, medical, or social issues pertaining to her children."

Therefore, despite respondent's prior adjudication of incompetency under Chapter 35A, we nevertheless conclude that the trial court did not abuse its discretion by failing to sua sponte conduct a second inquiry into the need to appoint a GAL for her under Rule 17.

In her final argument on appeal, respondent contends that when DSS filed its termination petition it was under an obligation to request the appointment of a GAL on her behalf. In making this argument, respondent cites Rule 17(c), which she interprets as imposing a requirement that a petitioner seek the appointment of a GAL if the petitioner has reason to believe that the respondent-parent is incompetent. *See* N.C.G.S. § 1A-1, Rule 17(c). She argues that DSS knew she was incompetent based upon the allegations contained in its termination petition, which described her limited capacity to care for Quanna, her inability to manage her funds appropriately, her low IQ, and her impaired adaptive behavior skills.

This argument is unavailing. We do not discern any language in Rule 17(c) that actually imposes a requirement on a county department of social services to request the appointment of a GAL for a parent believed to be incompetent. Although DSS did request in January 2018 that the trial court conduct an inquiry into the need for appointment of a GAL for respondent, the making of such a request—while

salutary—was not expressly required under Rule 17(c). Accordingly, this argument is likewise without merit.

## Conclusion

For the reasons set out above, we affirm the trial court's order terminating respondent's parental rights.

AFFIRMED.